TINOUSI JENNINGS as the Administratrix of the ESTATE and
Widow of the late DAVID ELI JENNINGS, and as
Guardian Ad Litem for JOHN DAVID JENNINGS, a Minor;
ZENOBIA ZELPHER JENNINGS; and
CHRISTABEL LUPE JENNINGS, Plaintiffs

v.

WALLACE H. JENNINGS, JACK THOMPSON,
ELIZA THOMPSON, TUA FALEMANU as the
TERRITORIAL REGISTRAR, and
AMERICAN SAMOA GOVERNMENT, Defendants

ESTATE OF DAVID JENNINGS,
TINOUSI JENNINGS, Executrix

v.

JACK THOMPSON and ELIZA THOMPSON, Defendants

High Court of American Samoa
Trial Division
Land and Titles Division

CA No. 11-84
LT No. 54-90

May 11, 1992

Before RICHMOND, Associate Justice, TAUANU'U, Chief Associate Judge, and MAILO, Associate Judge.

Counsel: For Plaintiff Tinousi Jennings, Charles V. Ala'ilima
For Defendants Jack and Eliza Thompson, Roy J.D. Hall, Jr.

These actions are for recovery of approximately 3.429 acres of land in Pava'ia'i, Island of Tutuila, American Samoa ("the land") from the possession of defendants Jack and Eliza Thompson. The vehicles selected to this end are declarations that the 1976 deed of the land by defendant Wallace Jennings to defendants Jack and Eliza is void and that plaintiffs are entitled to an undivided 2/15 interest in the land, eviction of Jack and Eliza, and correction of the Territorial Registrar's records. Plaintiffs also seek a constructive trust imposed on the properties of Jack and Eliza on the land to compensate plaintiffs for loss of use of the land, $10,000 in punitive damages, and an injunction preventing Jack and Eliza from making any further improvements to the land.

Jack and Eliza in turn seek to have the 1950 deed signed by Jack Thompson declared void or voidable, or in the alternative, to have a constructive or resulting trust declared on the land. They also assert a number of other affirmative defenses that are not addressed here.

This decision on the merits culminates a protracted series of judicial actions. The history of these actions is set forth in essence. The first of these cases, CA No. 76-83, was commenced in 1983 by the Executor/Administratrix Tinousi Jennings on behalf of the Estate of her late husband, David Eli Jennings, and on behalf of her six children. This action was dismissed early in 1984 when it became clear, on the motion of Jack and Eliza to dismiss or for summary judgment, that Tinousi had initiated the action on behalf of non-consenting offspring.

A new action, CA No. 11-84 (one of the present actions), followed almost immediately by Tinousi on behalf of the Estate, as David Jennings' widow and as guardian ad litem for her minor son John David, and by two adult daughters, Zenobia Zelpher Jennings and Christabel Lupe Jennings. This action was dismissed with prejudice in 1988 for lack of diligent prosecution.

CA No. 22-90, renumbered LT No. 38-90, was then filed in 1990 for relief essentially the same as that sought in LT No. 54-90 (the other present action). LT No. 38-90 was dismissed that same year on motion of Jack and Eliza on the grounds that CA No. 11-84 was dismissed with prejudice. The court noted, however, that a corrective remedy may exist in CA No. 11-84 under T.C.R.C.P. 60(b), permitting relief from a judgment or order based on mistake, inadvertence, or excusable neglect.

Thereafter, LT No. 54-90 was commenced, and a Rule 60(b) motion was filed in it. The Court ordered the motion heard as having been made in CA No. 11-84 to constitute a direct, rather than collateral, attack on the judgment in CA No. 11-84. After hearing, the court granted the motion. As a land matter, CA No. 11-84 should have been brought before the Land and Titles Division of the Court, not as a civil action before the Trial Division. There is a practical difference in these two stylings when dismissal for want of diligent prosecution is at issue. Dismissal on this basis in a civil action is with prejudice, while it is without prejudice in a land and titles action, recognizing that most civil cases should be concluded expeditiously, while land claims often warrant more prolonged consideration. The Court regarded this oversight by a court official, rather than any party or counsel, as a proper reason justifying relief from the CA No. 11-84 dismissal under Rule 60(b) and regarded the motion as made within a reasonable time.

The trial date in both LT No. 54-90 and CA No. 11-84 was then set.

## FINDINGS

For purposes of these findings, judicial notice is taken of the *Estate of Alexander E. Jennings*, PR No. 01-1960, and *Estate of David Jennings*, PR No. 12-77, in addition to the actions referenced above.

These actions involve the Jennings and Thompson families, and it is helpful in resolving the issues to indicate the relationships of family members immediately connected with those issues, as shown by stipulation and other evidence in the following chart:

Alexander Eli Jennings - Margaret Pedro
(Married)

Jack Thompson - Eliza Wallace Zilpher Lilly David - Tinousi
(Married) (Married)

It is also noted that Jack is of 3/4 Samoan blood while Alexander was of 1/2 Samoan blood.

By "Deed of Conveyance" dated December 13, 1948 (the 1948 deed), Pule, Matai of the Pule family, for himself and the Pule family, conveyed this land to Jack Thompson as Jack's individually owned land. The deed shows that Jack paid Pule $800 as consideration. On April 25, 1949, the Land Commission recommended the Governor's approval, and Governor Vernon Huber approved the transaction. The deed was recorded with the Territorial Registrar on May 2, 1949 (in vol. III of the Register of Land Transfers, at 14-15).

On July 31, 1950, Jack signed a "Deed of Conveyance" (the 1950 deed) transferring the land to Alexander Eli Jennings as Alexander's individually owned land. The recited consideration is the nominal $1. The copy of this document in evidence does not bear a recommendation of the Land Commission or the Governor's approval. It was, however, recorded with the Territorial Registrar on August 29, 1950 (in vol. III of the Register of Land Transfers, at 29).

At the time of these two transactions, Jack was married to Eliza, one of Alexander's daughters. They are still married. Jack was then a radioman in the U.S. Navy and was stationed in American Samoa. His testimony was that the $800 he paid for the land were part of his savings from his $245 monthly Navy pay. Since he was from the Manu'a Islands, the land was purchased for his immediate family's future use.

In 1950 Jack was reassigned to Honolulu. He testified that his father-in-law Alexander had told him on several occasions that he would look after his property while he was away. Before departing, Alexander approached him about signing the 1950 deed, saying it gave him permission to look after the land. Alexander only showed him the second page, on which appears only the attestation clause and the signatures of Jack and two witnesses.

Following his transfer to Hawaii in 1950, Jack continued to serve in the U.S. Navy until he retired in 1957. He was then employed by the U.S. Federal Aviation Administration (FAA) outside of American Samoa, including a substantial period of time when he was stationed in Guam.

At some time after July 1950 and before his death in 1958, Alexander constructed a small house on a foundation left by the U.S.

43

Marines on the land. However, the principal Jennings home remained in Utulei.

Probate of Alexander's estate was commenced in 1958 in this Court. The proceeding was initiated by a petition for letters of administration by the on-island heirs at law of Alexander and the Bank of American Samoa (the Bank), as the most competent creditor of the deceased residing in American Samoa; the Bank was appointed the administrator of the estate. In 1959, his will was found, naming the Bank as the executor of the estate. The will was executed in 1938. It was admitted to probate, and letters testamentary were issued to the Bank in 1960.

The land was included as part of the estate in the original petition for letters of administration and, since it was not covered by the will, passed by intestate succession. The order of final settlement, decree of distribution, and discharge of executor was issued by this Court on July 26, 1962. The order gave a 2/15th share each in the land to Eliza, Wallace, Lilly, and David, Alexander's living children, and to the heirs of Zilpher, his predeceased daughter.

Jack testified he did not know the land was included in the estate during the time of the probate of Alexander's estate. He did, however, state in an affidavit filed in CA No. 22-90, which he signed, but does not now recall signing, on June 26, 1990, that "it was not until my father-in-law's estate was probated in 1962 that I discovered that my Pava'ia'i land was deeded to him."

Based on a transcript of proceedings in the *Estate of Alexander E. Jennings*, PR No. 01-1960, Eliza and David were present at the close of this estate and responded to questions by the Court. Thus, Eliza and David knew in 1962 that the land was included in Alexander's estate. A reasonable inference from this fact is that Jack also knew about the inclusion of the land in Alexander's estate during its probate or at least shortly after its closing. A further reasonable inference is that Eliza became aware of Jack's version of the 1950 deed and its attendant circumstances contemporaneously with Jack's knowledge of the land's inclusion in Alexander's estate.

David and Tinousi Jennings were married in July 1962. Initially, they lived in the Jennings home in Utulei. However, they did live in the house Alexander built on the land from some time in 1964 until 1967 when they moved back to the Utulei home.

44

Tinousi testified that David related family history to her from time to time. The following is information pertinent to this case from this source. Alexander married Margaret Pedro. Five children, Eliza, Wallace, Zilpher, Lilly, and David, were born of this marriage. Alexander purchased the land for $800 from Pule in 1948 and brought people and animals from Swains Island to live there. However, he could not register the land due to the extent of his non-Samoan blood. Thus, Alexander had the land registered in his son-in-law Jack's name. After the law was changed in 1949, reducing the Samoan blood requirement and qualifying Alexander to own land, the 1950 transfer took place.

David died at age 34 in 1971 at the Utulei house following a fall. Tinousi is the administrator of David's estate.

Meanwhile, Jack and Eliza retired to American Samoa when Jack was unable to obtain an FAA assignment in American Samoa and decided to resign. Eliza came back in 1968 and moved into the house on the land after a few weeks in the Utulei home. Jack returned in 1969. Since their return, Jack and Eliza have continuously lived and still do live on the land. Over time they made substantial improvements to the land, including two additional houses, a store, and a tennis court. Tinousi first learned of the claim by Jack and Eliza to all of the land in 1968, but neither she nor any other Jennings family member made any objection to this claim or to the Thompson improvements until 1975, when Tinousi's plans to build a home there were denied by Jack and Eliza. Margaret, a daughter of David and Tinousi, testified to one emotional confrontation about this subject.

Regardless of when Jack learned of the inclusion of the land in Alexander's estate, Tinousi's building plans and claim to the land prompted Jack's first legal action to establish his title to the land. On attorney George Wray's advice, the land was deeded to Jack and Eliza in 1976. This "Deed of Conveyance," dated September 6, 1976 (the 1976 deed), was executed by Wallace H. Jennings, another of Alexander's sons, as "Trustee of the Estate of Alexander E. Jennings, deceased" and purported to transfer the land, in consideration of $1, to Jack and Eliza. Wallace's appointment as trustee is not documented.

This action turns on the consequences flowing from the three deed transactions.

1. *1976 Deed*

45

Since Wallace was not the trustee of Alexander's estate on September 6, 1976, he did not have any legal authority in that capacity to execute the 1976 deed of the land to Jack and Eliza.

Moreover, title to the land had been transferred to Alexander's intestate heirs by this Court's distribution order on July 26, 1962. Thus, any conveyance of the land to Jack and Eliza at any time after that date would require a deed executed by those heirs or their legal representative(s), rather than a representative of the estate.

The 1976 deed has no legal effect and must be cancelled.

## 2. *1948 and 1950 Deeds*

These deeds are discussed together due to the intimate interrelationships of the circumstances surrounding their executions.

As indicated above, Jack testified that he purchased the land for his immediate family's use, paying $800 from his savings. On the other hand, Tinousi testified that according to family history related by David, Alexander provided the $800 and purchased the land for the Jennings family's use. Under the law in 1948, Jack was able to own land in American Samoa, and Alexander was not permitted to own land. It is also true that both Jack and Alexander originated from outside the Island of Tutuila, from the Manu'a Islands and Swains Island, respectively. However, at the time, the Jennings had a family home in Utulei, while Jack, married to Alexander's daughter Eliza, did not yet own land to develop on Tutuila.

Evaluating the evidence as a whole, we find that the preponderance establishes that Jack purchased the land in 1948 as his individually owned land and not on Alexander's behalf.

The U.S. Navy's reassignment of Jack to Hawaii in 1950 created his need for someone to look after his property and affairs in American Samoa while he was away. We find that the discussions between son-in-law Jack and father-in-law Alexander about the land in that year were in the context of this management need and not due to the 1949 change in the law qualifying Alexander to own land. We further find that when Alexander presented the 1950 deed to Jack to sign, Alexander failed to reveal to Jack the true nature of the document. Alexander's acquisition of the land is properly construed in one of two ways.

46

When two persons, particularly family members, discuss and plan that one will manage the other's property or business affairs while he is away, a fiduciary relationship is established between them in the absence of actual fraud. Alexander's acquisition of the land was the result of constructive fraud or undue influence by Alexander, arising from a violation of a fiduciary relationship between Jack as son-in-law and Alexander as father-in-law. *See* Restatement of Restitution § 166 (1937); *Johnson v. Clark*, 7 Cal. 2d 308, 61 P.2d 767 (1936). It was also the result of an implied promise by Alexander to reconvey the land to Jack upon Jack's return to American Samoa, arising out of the fiduciary relationship. *See Steinberger v. Steinberger*, 60 Cal. App. 2d 116, 140 P.2d 31 (1943); 76 Am. Jur. 2d *Trusts* § 234 *et seq.* The evidence in support of both of these constructions was clear and convincing.

Under these circumstances, a constructive trust provides the remedy to transfer the property at issue to the person entitled to it. *See Calistoga Civic Club v. Calistoga*, 143 Cal. App. 3d 111, 117, 191 Cal. Rptr. 571, 575-76 (1983); Restatement of Restitution § 160 (1937); 76 Am. Jur. 2d *Trusts* § 221 *et seq.* After execution of the 1950 deed, Alexander held the land in trust for Jack and was obligated to reconvey the land to Jack no later than upon his return to American Samoa.

When Alexander died, the obligation of this constructive trust passed to the Bank of American Samoa as the Administrator of Alexander's intestate estate. Following distribution, that obligation was transferred to Alexander's intestate heirs.

In order to accomplish the effect of this remedial constructive trust some 42 years later, the 1950 deed should be canceled, and as a result, title to the land should now be vested in Jack Thompson through the valid 1948 deed.

*Equitable Estoppel*

Plaintiffs argue that Jack and Eliza are barred by equitable estoppel from taking unfair advantage of plaintiffs through the long-term failure of Jack and Eliza to assert fraud or other invalidity of the 1950 deed.

*Atuatasi v. Tu'ufuli*, 9 A.S.R.2d 67, 76 (App. Div. 1988) (quoting *Johnson v. Williford*, 682 F.2d 868, 872 (9th Cir. 1982)), sets forth a four-part test for estoppel:

47

1) The party to be estopped must know the facts;
2) he must intend that his conduct shall be acted on or must so act that the party asserting estoppel has a right to believe it is so intended;
3) the latter must be ignorant of the facts; and
4) he must rely on the former's conduct to his injury.

Three elements of equitable estoppel are not present in this action. First, if Jack and Eliza misrepresented or concealed any material fact, it was only their knowledge of the inclusion of the land in Alexander's estate when Alexander should only have had managerial powers over the land, not an ownership interest. Jack and Eliza became aware of this inclusion in Alexander's estate, at the latest, at some time between 1958, when the probate proceeding was instituted, and 1962, when the land was distributed to Alexander's intestate heirs. Alexander's intestate heirs were aware of the inclusion of the land in his estate contemporaneously with Jack and Eliza.

Second, plaintiffs have not shown that Jack and Eliza intended for the plaintiffs to rely on any misrepresentation or concealment. Jack and Eliza openly asserted their claim to the land as their land at least as of 1968-1969, when they permanently returned to American Samoa and took possession of and began to make substantial improvements to the land.

Finally, plaintiffs have not shown that they relied on any misrepresentation or concealment or that they suffered injury from it. As related above, Alexander's intestate heirs must have been aware of the claim by Jack and Eliza no later than 1969. There was no objection made to their claim by any of these heirs until 1976, when Tinousi offered her plans to relocate her home to the land and was refused. Thus, any misrepresentation or concealment was fully revealed before any injurious reliance could take place.

In fact, the remaining heirs appear to agree with the claim by Jack and Eliza to the land. Wallace certainly did agree, as evidenced by the 1976 deed. While they are not yet legally precluded from any judicial action, neither Lilly, nor any heir of Wallace, who died in 1989, nor any heir of Zilpher, who died in 1961, has participated in this action.

48

Plaintiffs have not shown any basis to estop Jack and Eliza from pursuing Jack's claim to own the land.

*Laches*

Similarly, Jack and Eliza's claim is not barred by the equitable doctrine of laches. The classic elements of laches have not been shown: "an unreasonable delay in the assertion of their [sic] rights by one party and undue prejudice to the other party." *Siofele v. Shimasaki*, 9 A.S.R.2d 3, 14 (1988). Even if there were an undue delay by Jack and Eliza in asserting their claim to all of the land, plaintiffs have not shown that they have suffered undue prejudice, just as they have not shown injury for the purposes of estoppel.

## CONCLUSIONS

A constructive trust on the land is established with Alexander E. Jennings and his successors in interest as trustees and Jack Thompson as beneficiary.

The 1976 and 1950 deeds are declared void and cancelled. The Territorial Registrar shall cancel the registrations of the 1976 and 1950 deeds. Jack Thompson is declared to be the owner of the land as individually owned land by virtue of the 1948 deed.

Judgment shall enter accordingly.

It is so ordered.